Et al. Mr. Fein for the appellant, Mr. Cady for the appellate Eugene Sullivan, Mr. Janda for the appellate United States. Good morning, counsel. Good morning. Thank you. Please proceed when you're ready. Thank you. Your honors, I'd like to at least correct, I think, two misunderstandings at the lower court with regard to the complaint. One, I think there was a misimpression that the my client, Iztok Plevnik, had signed a written engagement letter with a defendant, Mr. Sullivan, for $50,000. It's referenced in paragraph 14 of our complaint, and I think in the joint appendix, I mean, page 35, where I think the judge erroneously believed that engagement letter was with the defendant when it was not. There was never anything in writing between the appellant here, Iztok Plevnik, and Mr. Sullivan. There was never an agreement as to whether he would get paid anything, but I just wanted to clear up that one point. The second one, there seems to be some belief below by the district court that the funds that were involved here in Africa belonged or owned by the United States. There isn't anything in the record in the complaint that supports that speculation. It's odd that the United States, if it believed it owned the funds, wouldn't have sent their ambassador to go retrieve them or the embassy, which was alerted by Mr. Plevnik as to where the funds could be found in Ivory Coast. But those are two points I thought were important for the court to know about. With regard to Mr. Sullivan's, our claim of common law fraud against Mr. Sullivan, the district court decided that we had not adequately pled common law fraud because Mr. Sullivan had agreed to be Mr. Plevnik's lawyer, even though it was oral, he could serve pro bono. But I think it's standard law that if a person enters into a contract at the outset not intending to perform, that's a misrepresentation of state of mind, which can be a predicate of a common law fraud claim. And that's what we alleged in this case. I think it's replete of all the allegations which recite the betrayals of Mr. Plevnik in retrieving the billions of dollars in the Ivory Coast. How do you get around Chiharas and Ludwig? I couldn't hear you, Your Honor. How do you get around the Chiharas case and the Ludwig and Robinson case? Well, we think that those are cases where a violation of the contractor intent came after the formation. It wasn't misrepresentation of state of mind. And, Your Honor, we cite cases in our reply brief, which show clearly this court's conclusion that if at the time you make the contract, you do not intend to perform, here not intend to discharge duties of loyalty and honesty, that can be the foundation for a common law fraud claim. Of course, we have to prove it at trial. It's not something that can just be accepted as a presumption. I think in this case, the judge assumed that we had not alleged that that misrepresentation had occurred at the outset. But there's a fleeting reference. Well, later on in down the contract road, when Mr. Sullivan had performed some legal services for Mr. Plevnik, although we argue they were undertaken to induce Mr. Plevnik to reveal the whereabouts of the funds that Mr. The amended complaint refers to a payment of $50,000. That was to Rudy Giuliani, Your Honor, not to Mr. Sullivan. I think if you look at paragraph 14 of the complaint is $50,000 to Rudy Giuliani. That agreement remained dormant and never actually became operative. So we believe that the argument that's made that because there were some legal services performed that automatically it disproved common law fraud. But let me suggest the following analogy, just imperfect, but I think informative. Suppose you have a doctor. He's a heart surgeon. And he's paid by an enemy of a patient. Hey, I want you to amputate my patient. This patient's legs. You said he's paid by whom? What's the example? Excuse me? You said he's paid by whom? I just want to make sure I'm understanding. The doctor is paid by an enemy of the patient to represent that he's going to perform open heart surgery. But he really is going to amputate the legs of the patient because he wants to get back to the patient. And so the doctor undertakes preliminary services, takes the vital signs of the patient, advises on fluid and food intake. But then when the anesthesia is issued, instead of doing the heart surgery, he amputates the legs. I think that's a clear case of common law fraud, even though it's true that the doctor did perform some medical services, taking the vital signs, suggesting what fluid and food intake would be appropriate. The problem is that the Ludwig case holds that you've got to show that basically that the duties that are part and parcel of the fraud are divisible or different than the duties that were already within the scope of the contract. Well, you don't have that in your example, and I'm not sure how you have that in the facts alleged in your complaint. Well, Your Honor, I would just I would refer you, Your Honor, to this is a page in our reply brief. This is page four. These are citing cases of the D.C. Court of Appeals, which is the one that establishes the common law fraud elements because this is a D.C. cause of action. And you'll see on page four there it is black letter law. A party who signs a contract intending nonperformance has perpetrated common law fraud. And then there's a citation there. The question arises whether the breach of a contractual promise can ever be the subject of the tort of fraudulent misrepresentation. We have held that it can. I'm quoting from that decision, Your Honor. A promise or contractual commitment may be actionable. Fraud is misrepresentation. If at the time of its making, the promisor had no present intention of carrying it out. So let me ask where your strongest allegation is, then, which I assume you will argue the district court should construe most favorably to your client, because the amended complaint refers to various actions that appeared to be consistent with representation of your clients wish to repatriate these funds. Yes, Your Honor. It's a wonderful question. I think the answer is that we allege those services were done to induce confidence in my client that enabled him to reveal the whereabouts of the funds that resulted in the perpetrated another fraud without having that trust or confidence. My client, we allege, would never have revealed this information. So, Your Honor, that's that's the response to your question. I don't understand, then. Your client claimed that he had knowledge of funds. Coming from Libya that were in Africa. And he wanted to bring them to the United States. Correct. Yes, Your Honor, I think it was they were an ivory coast, but they may have originated in Libya. And the allegation about putting six million dollars in a local police station. The issue that the district court mentioned was the fact that the Department of Justice has responsibilities for recapturing funds abroad. And what is the allegation as to these funds that your client wanted to bring them back to the United States as his personal property? Your Honor, are you finished, Your Honor? I don't want to interrupt. I think the allegation is, Your Honor, that my client was in possession of the funds. He had obtained two letters from the Department of Treasury's general counsel saying, this is how you can transfer wire transfer the funds into the U.S. Treasury. And so did counsel. Did you hear my question? Yes, I did. So let me let me continue with that. The idea was that he, in possession of the funds, would be responsible for sending those billions back to the United States Treasury per the guidance that was given by the Treasury Department's general counsel. So what I'm trying to understand is, as I understand it, I could not transfer funds to the U.S. Treasury unless they were funds to which I was legally entitled. And then I would just be making, as it were, a donation to the United States government. Correct. And what we're saying, we're saying here, that's exactly what happened. It is possession. It was the funds were in the possession of my client. He was transferring the funds to the U.S. Treasury as a donation. Absolutely correct, Your Honor. Yeah, I don't get any of that from a complaint. But I understand you're saying construe it most favorably to your client. It was totally unclear to me. As to. I mean, why would he. I'll cease my questions. Thank you. No, if you're asking for the motivation, why would he make a donation like that? No, I'm not asking that. Okay. I apologize, Your Honor. I don't want to second guess you. I have one question for you. We will give you a little bit of time for rebuttal, which is, let's just suppose conceptually. I'll assume for purposes of this question that conceptually there's a route under which you could say, look, there was no intent to make good on the contract from the very outset. So it was a fraudulent enterprise from the get go. And that's a way to get around what otherwise could be a impediment to your ability to proceed. But then in order to support that, the complaint can't just allege that there was never an intent. There's got to be something more than that that would allow even at the dismissal stage, particularly given the particularity requirements associated with fraud claims that would allow for concluding that there's something to the notion that there was no intent from the outset to make good on the representation. We allege that shortly after this enterprise collapsed, shipwrecked, and my client was imprisoned and came back, the judge had bought very, very fancy home and vehicles, and that when the judge was asked to help when my client was in prison, he said, no, I'm sorry, I can't help you. That is, if you read the complaint carefully, it alleges clear actions by the judge that betray what would ordinarily be expected at his duty if he intended to really serve my client, to try to help him repatriate the money. And he didn't do that. But if you read through the allegations and the complaint, I think you'll find that. But that's the response we have. Okay, thank you. Make sure my colleagues don't have additional questions at this time. We'll give you a little bit of time for rebuttal. Thank you. Mr. Katie. Thank you, your honors. Steve Katie for defendant, a Pele, Gene Sullivan. May it please the court. Judge Cooper wrote to fulsome and thoughtful opinions in this case, and they should be affirmed. He applied the facts as pled to the law and reached the right conclusion. And as I think the questions this morning indicate, this case must be dismissed, not just because what the complaint does not plead, but exactly because of what it does plead. And with regard to Gene Sullivan, the case must be dismissed and the opinion below affirm for two independent reasons. First, the district court properly found the plaintiff did not plead a claim for fraud against Sullivan. Because plaintiff pleaded that Sullivan did, in fact, provide him with legal services. And there's a crucial paragraph at page six, paragraph sixteen of the complaint that Sullivan's it says Sullivan later entered into a conspiracy with to to capture the funds. And secondly, the district court was correct that plaintiff cannot satisfy the damages element for fraud because the money that he sought to repatriate did not belong to him. Of course, in the complaint pleads that the plaintiff told African officials where the money was located and twice brought it to African police stations. Thus, whatever Sullivan did to facilitate a meeting with DOJ in February of twenty twenty one did not cause plaintiff damages according to what plaintiff pleads in the complaint. These issues require dismissal and cannot be fixed because of what is pled. And I want to flush those two rounds out in more detail. First, with regard to no fraud, plaintiff says that his flagship allegation of fraud is paragraph fourteen of his complaint. And that's where he says that Sullivan said he would be plaintiff's lawyer. As Judge Cooper wrote in the opinion below, the complaint itself is replete, Judge Cooper says, with allegations showing that, in fact, Sullivan did provide legal services to plaintiff. And I'd highlight paragraphs seventeen and eighteen and thirty five and thirty seven and thirty nine of the complaint, all of which describe legal services that Gene Sullivan provided to plaintiff, including working with Treasury Department to alert them to funds, working with DOJ to coordinate a meeting to help plaintiff repatriate the funds and also working with plaintiff's wife to help get plaintiff out of detention. When he was in detention, Judge Cooper's analysis of these legal services is found at pages forty one and forty two of the record, where he concludes, quote, Sullivan's agreement to represent plaintiff was literally true. Moreover, this is crucial. The complaint alleges that the attorney client relationship was formed in June or July of twenty twenty. And that's it. Paragraphs twelve, thirteen and fourteen of the complaint, June or July of twenty twenty. And it says that Sullivan later in February of twenty twenty one, quote, entered into a conspiracy, close quote, with DOJ lawyers. And that's it. Paragraph sixteen of the complaint. Thus, the complaint does not and cannot be amended to allege that the attorney client relationship was entered into with the intent to defraud plaintiff because it alleges that the conspiracy with DOJ was entered into eight months later in February of twenty twenty one entered into, it says. And it also alleges, of course, that Sullivan provided legal services both before and after that date. And as a result, Judge Cooper properly determined that no fraud was pled. Secondly, there can be no damages for two reasons. First, the complaint makes clear a paragraph eleven that this money is not plaintiffs to begin with. It says it was scattered across Africa after the fall of the Libyan dictator. And Judge Cooper properly determined that that meant that the the money did not belong to plaintiff and instead belong to Treasury, thus the repatriation effort. And that's at page forty four of the appendix. And secondly, there can be no damages because plaintiff himself pleads that he brought the money to two African police stations and he told officials in Africa where it was. And thus, whatever happened at that DOJ meeting in February of twenty twenty one, where plaintiff told DOJ the location of the money can't be tied or can't be the cause of its alleged disappearance because the cause is pled in the complaint. We know it's because it was delivered to police stations in Africa and thus there's no fraud. There are no damages. And Judge Cooper's thoughtful opinion we submit should be affirmed. Thank you, counsel. Thank you. We hear from the government now. Mr. Janda. Thank you, your honor, and may it please the court. Sean Janda for the United States. I think at this point, everyone agrees that the underlying conduct that the federal officials here are alleged to have engaged in meeting with the plaintiff interviewing the plaintiff is the sort of conduct that they are employed to do. I mean, the only question is whether the sort of allegations that that conduct was engaged in for an improper purpose can take it outside of scope. We've explained in our briefs why the allegations in this case can't do that work. And I'm happy to address any questions the court might have. But in the absence of questions, also content to rest on a briefs on this point. I have just one theoretical question. So there's often fact patterns. One sees in the cases where the stream of conduct that the government, the defendant government officer is engaged in is the kind of thing that we would say at some level of generality. The government officers is employed to do. But then there will be some kind of detour in the midst of that that parts ways with what the government officers generally employed to do. And sometimes they're really extreme situations where somebody does something that's a violent crime or something of that nature that seems obviously outside the scope in some descriptive way of government officers do. And sometimes it's a little bit more of a minor blip. But really, we're just talking about kind of products and detours in some dimension. And how would you characterize the way in which a court is supposed to know whether the conduct that diverts from the path of what a normal government officer would do takes it outside the zone of something that would be scope for purposes of Westfall? How would you describe the inquiry? Yes, I think both Carol on the substantive law and then this court's opinions on the Westfall Act make clear that you have to look at the underlying conduct that sort of the controversy that the alleged tort arose out of. And then I think there's just sort of a qualitative analysis about how tightly tied to the job duties the tort ultimately becomes, whether it's a minor blip or a huge detour. That being said, I think in this case, the court certainly doesn't have to address that. The allegations of any sort of blip here I think are so threadbare that the court doesn't need to credit them even the motion to dismiss stage and disregarding the bare allegations of improper purpose. I think what you're left with is just conduct that is in the core of what these federal employees are. So that might be true on the facts of this case. I mean, I don't want to argue with you on that for now, but when you say a qualitative assessment, what would you do? What are the guideposts? What would you look at? And would you look at the factors that Carol outlined? Yeah, I mean, I think Carol goes through the overall analysis in some detail and specifically focuses on the timing analysis for a couple of pages. I think that hasn't been the focus of our briefing here, but does say that you're looking at the underlying conduct. You're not looking at the tort itself or the moment the tort was committed. You probably have to be tightly scoped to the tort in some sense. I mean, you're not looking at sort of if you have a multi-day spree that happens that's sort of initially started as a job-related thing but then goes far off. You're probably outside scope. So if there's a momentary blip, you're probably within scope. Where one turns into the other, I think it's pretty hard to provide kind of specific guideposts or analysis. I mean, Carol is very holistic and qualitative on this point and sort of the rest of the analysis. But here again, I think that the allegations here are just so thin. I think under any plausible pleading standard, the court can disregard them for purposes of resolving the certification question in this case. And leave that for another day. Okay. Thank you, counsel. Thank you. Mr. Fine, we'll give you two minutes for rebuttal. Thank you, Your Honor. Appreciate the opportunity. A couple things. My colleague declared that there was an incompatible inconsistency between the allegation that at the time that the attorney-client privilege was established in June of 2020, we allege that there was at that time an intent not to comply with the obligations that were inherent in that relationship. And a later conspiracy. But just because it took time for the defendant, Mr. Sullivan, and he had army rangers who were his friends, they were the ones who were involved in this case, to later bring in other people, this doesn't mean that he couldn't have formed his own intent at the outset to plot towards undermining his obligations towards Mr. Plevenick as an attorney. The second thing, quickly, about the ownership of the funds. Possession is nine-tenths of the law. We recited the ordinary standard that if someone possesses funds, unless a rival claims that it's theirs, the law presumes possession is ownership. There was no one in this case that's ever disputed that Istok Plevenick owned the funds that were to be repatriated. Indeed, remember, in the complaint, we allege that there were two letters prepared by the general counsel of the Department of Treasury to Mr. Sullivan saying, this is how you repatriate this money to the U.S. Treasury from Ivory Coast. Two letters they referred to in the complaint. Why would those letters even be drafted if money was already belonged to the United States? There wouldn't be any need for repatriation. And if Mr. Plevenick didn't have the ownership of the money, he couldn't repatriate it anyway. He'd just be a bystander. And third, with regard to the argument that, well, Mr. Plevenick had disclosed to certain people in Ivory Coast about the whereabouts and that was the cause of the damage. But we have alleged that if Mr. Plevenick had honored his obligations, the funds would have been repatriated in a timely fashion. The last thing, and I appreciate your honor for indulging this, this relates to the point of the Westfall Act. It's clear one of the indispensable prongs for qualification is that at least part of the motivation for the challenge, at least in part was actuated by a goal to benefit the employer here in the United States. Here, what we allege was that the challenge acts were intended to injure the United States by depriving it of six billion dollars. Let me give you this quick analogy. Suppose someone says, I'm going to be a toll operator at a booth and get money from the cars that come through the toll. But at the time he becomes that operator says, I'm going to steal the money. So he uses his position, taking the tolls, receiving the money from the drivers, they go through and he steals the money. It would be very hard, it seems to me to say, that there was an intent, at least in part in those circumstances, to benefit the employer. The intent was to benefit himself. You have no questions. Thank you. Thank you, counsel. Thank you to all counsel. We'll take this case under submission.
judges: Srinivasan; Wilkins; Rogers